**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MORGAN STANLEY SMITH BARNEY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-06373 |
| | ) | |
| v. | ) | Hon. Joan B. Gottschall |
| | ) | |
| RONALD OUWENGA, BRIAN THOMAS, MYRON HENDRIX, MICHAEL BRUNER, JEFF SCHIMMELPFENNIG, and ZACHARY BIRKEY, | ) ) ) ) | Magistrate Sidney I. Schenkier |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

Defendants, Ronald Ouwenga, Brian Thomas, Myron Hendrix, Michael Bruner, Jeff Schimmelpfennig, and Zachary Birkey ("Defendants"), by and through their attorneys, Gary I. Blackman, Jason B. Hirsh and Jamie L. Burns of Levenfeld Pearlstein, LLC, file this Memorandum in Opposition to Plaintiff, Morgan Stanley Smith Barney LLC's ("Morgan Stanley" or "MSSB") Motion for a Temporary Restraining Order.

**PRELIMINARY STATEMENT**

Defendants have worked in an around Bourbonnais for most of their adult lives day, by comparison a relatively small financial services market. Unlike in the larger, more urban, markets, these advisors might service hundreds or even thousands of more modest accounts. With one exception, Defendants' ages range from 55 to 72. While at Morgan Stanley, their incomes ranged between $145,000 and $350,000.

There is no competent evidence that Defendants did anything wrong. The affidavits that are submitted, as discussed below, are inadequate. A review of the proposed order asks this

Court to prohibit all the Defendants from soliciting <u>any</u> Morgan Stanley Client Accounts and to not keep or disseminate any of its confidential information. Said another way, Morgan Stanley is asking the Court to order that Defendants comply with their agreements, which is not the purpose of equitable relief.

Critically important to this Court's analysis is the unilateral change in terms (without consideration) as to all Defendants' agreements when MSSB withdrew from the Protocol for Broker Recruiting effective November 3, <u>2017</u>. Before its withdrawal, if Defendants resigned they would be <u>*free from liability* even if they executed an enforceable agreement not to remove such information and/or to not solicit their clients so long as they complied with the Protocol.</u> Now, MSSB, having changed the terms unilaterally, is filing countless lawsuits against Defendants like in the case at bar, who joined the firm with one expectation only to now have their hands tied for reasons outside their control.

Moreover, it is simply not true that Plaintiff has "an inadequate remedy at law" or will be "irreparably harmed." There are no allegations that Plaintiff has lost any customers because Defendants violated any non-solicitation provisions. If and when Plaintiff ever determines that it has lost clients because of something Defendants did, then Plaintiff will be able to easily calculate its damages (typically its anticipated net profits from a particular client over a reasonable amount of time). Conclusory statements as to "irreparable harm" or "inadequate remedy at law" are not sufficient.

As evidence of Plaintiff's failure to meet the requirements necessary to obtain a temporary restraining order, this Court should note the following (discussed in more detail below:

- The Motion improperly relies "On Information and Belief." The Motion for TRO provides "[a]s stated in the Complaint, the Defendants, ***upon information and belief***,

have misappropriated, and continue to use, Morgan Stanley's trade secret information…" (emphasis added).

- Each and all of MSSB's affidavits concerning the allegation that any Defendant solicited an MSSB customer are predicated upon improper hearsay. The affidavits make statements like "we have reason to believe" or "based on Morgan Stanley's conversations with its clients." The clients are not identified, and there are no affidavits from the clients themselves.

- Four of the non-solicitation agreements put forth by Plaintiff were signed in November 2017. Each of those Defendants began working for Morgan Stanley in 2012, when Morgan Stanley bought Smith Barney. There was no consideration for having an employee sign a non-solicitation five (5) years after their employment began.

- 4 of the 6 Defendants are not referenced at all in any of the affidavits submitted by Morgan Stanley and therefore there is no basis for the entry of a temporary restraining order against Ronald Ouwenga, Myron Hendrix, Jeff Schimmelpfenig or Zachary Birkey.

- The Code of Conduct is not a contract;

And, as to the belatedly served affidavit (received the night before hearing), the affidavit is devoid of specific facts upon which it presumably wants this Court to rely, and puts Plaintiff's credibility at issue. This affiant states that a client told him that he received "a package" from "one or all the Defendants." Why could not the client submit its own affidavit? Why were not the mailing labels attached to show from where the package came? And why was the package not opened so that this Court could know what it contained?

Each individual Defendant has submitted an affidavit stating that he was advised by his new employer to not solicit customers and to not take possession of any information belonging to the Plaintiff. Each Defendant has testified under oath that he did neither. There is, therefore, nothing before this Court to allow it to conclude that there is a likelihood of Plaintiff prevailing on its claims against each Defendant such that the temporary restraining order is warranted.

### *Factual Background - The Protocol for Broker Recruiting*

To put this litigation and the Motion for TRO in context, and to appreciate the punitive nature of it, is helpful for this Court to understand how and why a Morgan Stanley recently (and unilaterally and without consideration) changed the terms of its employment agreements with thousands of its advisors (including these Defendants), so that lawsuits and motions like in the case at bar could be brought.

In August 2004, Citigroup Global Markets, Inc. (Smith Barney), Merrill Lynch, Pierce, Fenner & Smith, Inc., and UBS Financial Services, Inc. entered into an agreement entitled The Protocol for Broker Recruiting. (The Protocol refers to financial advisors as Registered Representatives or "RRs."). The Protocol provides, in part, as follows:

> *The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms.* ***If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability*** *to the firm that the RR left by reason of the RR taking the information identified below or* ***the solicitation of the clients serviced by the RR at his or her prior firm***... (Emphasis Added)
>
> ***
>
> *When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information.*
>
> ***
>
> ***RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms****, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm.*

See *Broker Protocol*, attached as **Exhibit 1.**

The Protocol (now with over 1,000 securities industry signatories, including Stifel), therefore, allows financial advisors changing employment from one firm to another to:  1) take

lists of information pertaining to the clients they serviced, including their clients' names, addresses, phone numbers, email addresses and account types; and 2) freely use that information to solicit those clients, regardless of any restrictive covenant the advisor may have signed  If they follow the Protocol, the departing financial advisor, and his/her new employer, <u>*are free from liability* even if they executed an enforceable agreement not to remove such information and/or to not solicit their clients.</u>

While under the Protocol, MSSB hired countless financial advisors from the competition, who, because of MSSB's Protocol membership, were able to bring lists of their clients and contact information and to use that information to solicit their clients to join them at MSSB. Likewise, over the course of thirteen years, thousands of financial advisors left MSSB, took their clients list with them, and openly solicited those clients to join them at their new firms, all with impunity.

Furthermore, and significantly for this matter, by being a member of the Protocol for thirteen years, MSSB has admitted that client names and contact information does not constitute protectable confidential or trade secret information.  Indeed, by allowing its departing financial advisors to leave with lists of client names and contact information, MSSB has "effectively declared that it does <u>not</u> consider this [c]lient [iI]nformation to be 'nonpublic personal information' under the federal Gramm-Leach-Bliley Act, Pub.L. No. 106-102, 113 Stat. 1338 (1999) (codified at 15 U.S.C. § 6801 *et seq.*)("the Act")."  *Smith Barney Div. of Citigroup Glob. Markets Inc. v. Griffin*, No. CIV.A. 08-0022-BLS1, 2008 WL 325269, at *7 (Mass. Super. Jan. 23, 2008) (applying New York law).  If [this information] is not fairly characterized as 'nonpublic personal information,' then presumably it can be fairly characterized as public personal information, and, if so characterized, it can hardly be viewed as confidential." *Id.  See*

*also Merrill Lynch v. Abdallah et al.*, Case No. 45D11-0608-PL-77 (Ind. Super. Ct., August 17, 2006)("[I]t cannot be said that Merrill Lynch is likely to succeed on its trade secret claim when it does not treat such client identifying information as a secret when brokers move to firms that are of part of the protocol."). Thus, just like Smith Barney, its predeccesor firm, MSSB cannot establish that its client names and contact information is confidential or that it has a protectable legitimate business interest in client names or contact information which would support a restrictive covenant under Illinois law.

### *Morgan Stanley Unilaterally Changes Its Employment Agreements*

MSSB was a member of the Protocol. It joined in 2009 and withdrew from the Protocol effective November 3, 2017. *See Group Exhibit 2.* Thus, from when each Defendant joined MSSB years ago and up and until November 3, 2017, <u>each Defendant could have solicited any client it wanted so long as it complied with the Protocol and only removed.</u> MSSB withdrew from the Protocol unilaterally. It did not give its advisors and consideration for changing the terms of their agreement and did not give their advisors the option of staying or leaving before its withdrawal from the Protocol.

More egregiously, this is the proverbial bait and switch. Each of the Joint Production Agreements are dated November 3, 2017. At that time, MSSB was a member of the Protocol, meaning, as noted above, the post-employment restrictions upon the Defendants were dictated by the Protocol <u>not</u> the Joint Production Agreements or any other agreement. Indeed, each of the Joint Production Agreements makes clear to the signer that the terms of the Protocol trump any restriction set forth in the Joint Production Agreements. Then, just <u>three days</u> after execution of the Joint Production Agreements, on November 6, 2017, MSSB exits the Protocol. <u>What is more, MSSB's Protocol withdraw notice is dated October 24, 2017, which means that MSSB</u>

<u>knew that it was exiting the Protocol but omitted this from Defendants leading them to believe</u>

<u>that the Protocol would be applicable</u>. . This is not only inequitable, but MSSB should be

estopped from taking advantage of such bad faith conduct.

## APPLICABLE LAW

In *Tecnitoys Juguetes, S.A. v. Distributoys.com, Inc.*, No. 11 CV 3731, 2011 WL

2293855, at *1 (N.D. Ill. June 9, 2011), this Court set forth the standards for

issuing temporary restraining orders. To obtain the temporary restraining order it has proposed,

Tecnitoys must show that: (1) it is likely to succeed on the merits, (2) it is likely to suffer

irreparable harm without the temporary restraining order, (3) the harm it would suffer is greater

than the harm that the temporary restraining order would inflict on the defendants, and (4)

the temporary restraining order is in the public interest. *Judge v. Quinn,* 612 F.3d 537, 546 (7th

Cir.2010) (setting forth the requirements for a preliminary injunction) (citing *Winter v. Natural*

*Res. Def. Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008); *St. John's*

*United Church of Christ v. City of Chi.,* 502 F.3d 616, 625 (7th Cir.2007)). "How strong a claim

on the merits is enough depends on the balance of harms: the more net harm an injunction can

prevent, the weaker the plaintiff's claim on the merits can be while still supporting some

preliminary relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.,* 582

F.3d 721, 725 (7th Cir.2009) (citing *Cavel Int'l, Inc. v. Madigan,* 500 F.3d 544 (7th Cir.2007),

and *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S., Inc.,* 549 F.3d 1079 (7th

Cir.2008)).

A TRO is "an extraordinary and drastic remedy, one that should not be granted unless the

movant, by a clear showing, carries the burden of persuasion." *See Goodman v. Ill. Dep't of Fin.*

*& Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir.2005); *Sw. Airlines Pilots' Ass'n v. City of*

*Chicago*, 186 F. Supp. 3d 836, 839 (N.D. Ill. 2016) (the standard for a TRO and preliminary injunction are the same).

## ARGUMENT

**I.     MSSB'S Motion Improperly Relies "On Information and Belief" Allegations**

Consistent with this high burden, it is well-established that a TRO should not be entered based upon facts that are not established on the pleadings and only alleged "upon information and belief." *Advocacy Org. for Patients and Providers v. Mercy Health Serv.*, 987 F. Supp. 967, 974 n. 13, (E.D. Mich 1997) (citing *Marshall Durbin Farms, Inc. v. Nat'l Famers Org.*, 446 F.3d 353, 357 (5th Cir. 1971)); *see also Bowels v. Montgomery Ward & Co.*, 143 F.2d 38, 42 (7th Cir. 1944) ("… [an] application for a preliminary injunction cannot be based on information and belief, but must be based on facts..."). Yet, here, the Motion for TRO provides "[a]s stated in the Complaint, the Defendants, ***upon information and belief***, have misapporpriated, and continue to use, Morgan Stanley's trade secret infromation…"   (emphasis added).   Clearly, MSSB is inappropriately seeking the drastic remedy of a TRO without a factual predicate and, instead, relying upon guesswork and conjecture.

**II.     MSSB'S Motion Rests Entirely on Hearsay**

Each of the affidavits submitted by Plaintiff are either so inadequate and non-specific as to not support the claims or are inadmissible for the purpose for which they are intended.  The affidavits make statements like "we have reason to believe" or "based on Morgan Stanley's conversations with its clients." The clients are not identified, and there are no affidavits from the clients themselves.

All the MSSB's affidavits concerning the allegation that any Defendant solicited an MSSB customer are predicated upon improper hearsay.  *Hong v. Children's Mem'l Hosp.*, 993

F.2d 1257, 1265 (7th Cir. 1993) ("hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c)"). Indeed, MSSB does not provide an affidavit from any customer that was allegedly solicited, instead relying on the affidavits of its own employees to recount purported conversations. The Seventh Circuit has made clear "[w]e do not consider hearsay statements that are otherwise inadmissible at trial, and this limitation applies to deposition testimony based on inadmissible hearsay." *Hong,* 993 F.2d at 1264. Thus, MSSB's attempt to base its Motion for TRO on hearsay is improper and insufficient as a matter of law.

The degree to which Morgan Stanley is trying to make a case for a temporary restraining order that is simply not there to make may be best evidenced by the late filing of an additional affidavit (Frank Dorsett) at 4:15 p.m. on September 20, 2018, the night before this hearing. Mr. Dorsett's affidavit states, in its entirety, as follows:

- I submit this Affidavit in support of Morgan Stanley's Motion for a Temporary Restraining Order and Preliminary Injunction against Defendants. I am a financial advisor for Morgan Stanley. I have been employed in the securities industry for nearly 35 years.

- Around 2 pm central time today, I spoke with a client formerly serviced by Defendants. The client indicated to me that he received a "package" from one or all of the Defendants in connection with their move to Stifel. The client indicated that the client did not speak with any of the Defendants prior to receiving the "package."

The affidavits should be stricken.

III.     **There are no allegations of wrongdoing alleged against 4 of the 6 Defendants**

Plaintiff filed its Complaint and Motion for TRO against Defendants Ronald Ouwenga, Brian Thomas, Myron Hendrix, Michael Bruner, Jeff Schimmelpfenig and Zachary Birkey, attaching to its Motion for TRO separate agreements signed by each. In its Complaint, Plaintiff

collectively refers to each of these individuals as "Defendants" and makes no distinction between them and sets forth no specific allegations particular to one or the other.

Plaintiff's Motion for TRO and Memorandum in Support Thereof is not evidence. It is argument only. The only "evidence" put before the Court is set forth in the affidavits submitted. In those affidavits, there are no references <u>whatsoever</u> to any alleged wrongful conduct engaged in by Ronald Ouwenga, Myron Hendrix, Jeff Schimmelpfenig or Zachary Birkey. As there is no evidence any wrongdoing engaged in by these Defendants, they cannot legally be found to have violated any agreements, assuming the agreements are found to be valid and enforceable.

While it is true that the Defendants resigned together and, for marketing and other purposes, refer to themselves as a "team" (both at Morgan Stanley and now), they are separate and distinct defendants and are not a legal entity or partnership. Each works for its new employer individually and each, individually, is responsible for its own conduct. Plaintiff has not argued (because it can't) that there exists some kind of "team liability" or that one of the advisors can be held responsible for the alleged wrongful acts of another.

**IV.    Plaintiff is not likely to succeed on the merits.**

   *A.    The Code of Conduct is Not a Contract*

With respect to the Code of Conduct, which is alleged to have been breached in Count I, MSSB asserts that this is contract and it can enforce it as such.  Curiously, MSSB does not attach the Code of Conduct in its entirety to the Complaint.  This may not be a mistake.  MSSB may be attempting to hide the disclaimer in the Code of Conduct that states that it is not a contract. *Robinson v. Morgan Stanley*, No. 06 C 5158, 2007 WL 2815839, at *16 (N.D. Ill. Sept. 24, 2007), *citing  Workman v. United Parcel Service, Inc.,* 234 F.3d 998, 1000 (7th Cir.2000) ("[a] clear and forthright disclaimer 'is a complete defense to a suit for breach of contract based on an

employee handbook.'"). Moreover, MSSB does not allege nor demonstrate that any of the Defendants signed the Code of Conduct much less received consideration in return for any purported agreement with respect to the Code of Conduct. *Steinberg v. Chicago Med. Sch.*, 69 Ill. 2d 320, 330 (1977) ("[c]onsideration is a basic element for the existence of a contract"). Accordingly, MSSB is not likely to succeed on the merits with respect to its purported breach of contract based upon the Code of Conduct.

**B.      *The Joint Production Agreements Are Unenforceable as Between the Parties***

Even a cursory review of the Joint Production Agreements attached as Exhibit A to the Complaint indisputably demonstrates that MSSB is not a party to the agreements. In fact, in Section I of the Joint Production Agreements, the document makes clear that "Joint Producers," *i.e.*, financial advisors, may enter into such agreements. MSSB's only involvement is authorizing joint producers to enter the agreement.

Even if this Court determines that MSSB is a party to the Joint Production Agreements, each agreement is date in November <u>2017</u>, and MSSB alleges that Defendants resigned on September 13, 2018, less than one year later. Thus, the Joint Production Agreements fail for want of consideration.

Under Illinois law, in order for a post-employment non-solicitation covenant to be enforceable, it must be supported by "adequate consideration" consisting of employment for a "substantial period" of time <u>after execution</u> of the covenant that the former employer seeks to enforce. *Fifield v. Premier Dealer Servs.*, 2013 IL App (1st) 120327, ¶¶13-14, *cert. denied* 996 N.E.2d 12. In *Fifield*, the First District reaffirmed "… that there must be at least two years or more of continued employment to constitute adequate consideration in support of a restrictive covenant." *Id.* at ¶19. The First District's reasoning for this bright-line rule is that at-will

employment and its associated compensation is illusory. *Id.* at ¶14; *Diederich Ins. Agency, LLC v. Smith*, 2011 IL App (5th) 100048, ¶13 (Illinois courts analyze the adequacy of consideration in the context of post-employment restrictive covenants because "[w]hen a defendant is an employee at will, ... his continued employment is an illusory benefit because the minute after he" agrees to the restrictive covenant, his employer "could ... fire[] him and then he would have received nothing in exchange for his fresh promise" to be bound by the restrictive covenant. *See e.g., Fifield*, 2013 IL App (1st) 120327, ¶¶3-4, ¶19 (inadequate consideration for non-competition and non-solicitation covenants where employee resigned three months after signing covenants)*; McInnis v. OAG Motorcycle Ventures, Inc.*, 2015 IL App (1st) 142644, ¶4, ¶7, ¶38 (inadequate consideration for non-competition covenant where the employee was paid a base salary and commissions in connection with his employment and resigned eighteen months after signing covenant); *Prairie Rheumatology Assocs., S.C. v. Francis*, 2014 IL App (3d) 140338, ¶3, ¶5, ¶16, ¶19 (inadequate consideration for non-competition covenant where the employee was given annual salary and the effective date of the resignation was nineteen months after signing covenant); *Brown and Brown, Inc. v. Mudron*, 379 Ill. App. 3d 724, 726 and 729 (3d Dist. 2008) (inadequate consideration for non-solicitation covenant where the employee resigned over five years after beginning employment and seven months after signing covenant); *Diederich*, 2011 IL App (5th) 100048, ¶¶3-5, ¶¶14-15 (inadequate consideration for non-solicitation covenant where the employee resigned approximately nine months after signing the original covenant, and three months after signing covenant that was narrowed in scope from the original). Here, MSSB clearly cannot clear the two year threshold.

Additionally, the Joint Production Agreements restrict solicitation of only "Client Accounts." That term is defined in the agreements to mean only client accounts that are to be

"joint[ly] produced" or "committ[ed] to be handled under the JP Arrangement…"  To ensure that the accounts subject to the non-solicitation restrictions are identifiable, the Joint Production Agreements explain that each financial advisor agreeing to a Joint Production Agreement is required to "… list Client Accounts contributed and handled under the JP Arrangement on Schedule 'A' to the JP Agreement (the 'Client List')."  Yet, here, MSSB <u>never</u> identifies the customers that were allegedly solicited nor does it state or show that the allegedly solicited customers fall within the "Client Accounts" under the Joint Production Agreements. And MSSB cannot simply state that all customers fall within Client Accounts because the Joint Production Agreements only require a financial advisor to commit "50% of their individual Trailing 12 month ('T12') revenue" to the Joint Production Agreement.  In other words, on the face of it, it is unclear which clients fall into the definition of "Client Accounts."

The confidentiality provision set forth in Section IV of the Joint Production Agreements is wildly overbroad and unenforceable as matter of law.  The confidentiality provision defines every morsel of information regarding any Client Account as confidential.  Indeed, under this definition, a picture of a client falling under the ambit of the Joint Production Agreements is confidential.  There is no possibility that MSSB could have a legitimate interest this broad.  *See e.g.*, *AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863, ¶46 (overbroad and unenforceable confidentiality provision);  *Carlson Grp., Inc. v. Davenport*, No. 16-CV-10520, 2016 WL 7212522, at *4 (N.D. Ill. Dec. 13, 2016). The confidentiality restriction is also unenforceable because it lacks a geographic restriction.  *Carlson*, 2016 WL 7212522, at *5.

C.      *The Two Financial Advisor Employment Agreements are Unenforceable*

MSSB alleges that it had employment agreements with only two of the Defendants – Myron Hendrix and Ronald Ouwenga.  Neither of these agreements is enforceable.

Akin to the Joint Production Agreements, the two employment agreements define confidential information as everything under the sun. *See* Section 2.1. In fact, each of the employment agreements, in loosely describing the scope of "confidential infromation" uses the catch-all "including without limitation" to cover any and all information that Hendrix or Ouwenga may have come into contact with, even information that is made public by MSSB. Additionally, the provision does not have a temporal or geographic limitation. MSSB cannot possibly have a legitimate interest in such an overbroad restriction. And, thus, it is not unenforceable. *Carlson*, 2016 WL 7212522, at *5; *see also AssuredPartners,* 2015 IL App (1st) 141863, ¶46.

Additionally, Section 3.2, the non-solicitation covenant is way broader than could possibly be necessary to preclude Hendrix and Ouwenga from "abusing the specific client relationships [he] built up during [his] time with the company." *Cambridge*, 378 Ill. App. 3d at 455; *AssuredPartners*, 2015 IL App (1st) 141863 at ¶¶39-40; *Eichmann v. Nat'l Hosp. and Health Care Servs., Inc.*, 308 Ill. App. 3d 337, 345 (1st Dist. 1999). ("… an activity restraint must be reasonably related to the employer's interest in protecting customer relations that its employees developed as a direct result of the employment"). Section 3.2 limits Hendrix and Ouwenga from soliciting "… any of Morgan Stanley's customers who were served by [them], or whose names became known to [them] while in the employ of Morgan Stanley..." That is, this covenant covers relationships that were not developed by Hendrix or Ouwenga and past and future MSSB customers as long as the customer's name became known to Hendrix or Ouwenga while employed by MSSB. There is no basis in Illinois law for such a wildly overbroad restriction and MSSB certainly goes well beyond any legitimate interest it might have.

14

*AssuredPartners* is directly on point. There, the court rejected an employer's attempt to restrict a former employee from soliciting not just the customer relationships he may have built while in the employ of plaintiff, but, like here, even future customers. 2015 IL App (1st) 141863, ¶17, ¶¶39-40. Relying on *Cambridge*, the Court stated "[w]e find section 3(b) broader than necessary to protect plaintiffs' interest in preventing Schmitt from exploiting the client relationships he developed and maintained during his employment at ProAccess." *Id.* at ¶40.

### D.      MSSB Has Not Alleged a Violation of the Illinois Trade Secrets Act

In the Motion for TRO "[a]s stated in the Complaint, the Defendants, ***upon information and belief***, have misapporpriated, and continue to use, Morgan Stanley's trade secret infromation…" (emphasis added). In its supporting Memorandum, and with respect to this matter, MSSB argues that is entitled to a TRO because Defendants allegedly breached the Illinois Trade Secrets Act ("ITSA"). MSSB does not satisfy its burden of demonstrating a likelihood of success on the merits.

In the first instance, and as a preliminary matter, MSSB has not alleged in its Complaint any claim for violation of the ITSA. A fundamental element of a request for injunction is likelihood of success on the merits, but there will never be a merits dispute about ITSA because it is not a cause of action alleged in this lawsuit. Fed.R.Civ.P. 8(a) (defining a claim for relief as a "short and plain statements of the claim showing that the pleader is entitled to relief"). This is dispositive and demonstrates that there is no likelihood of success on the merits with respect to a non-existent claim. As such, there is no basis for MSSB to seek injunctive relief on the basis of ITSA.

What is more, and despite the fact neither the Complaint or the Motion for TRO argue that any Defendant absconded with "client lists," nor do any of the supporting affidavits

submitted by MSSB suggest that client list was taken by or is possessed by any defendant, the supporting Memorandum makes the unsupported statement that Defendants (who it does not say) have a client list. Still, according to MSSB, this "[imaginary] client list" "… is a trade secret under the Illinois Trade Secret Act." This argument should be rejected out of hand. Not only has MSSB failed to interpose a claim under the ITSA, it has likewise failed to show that any Defendant has a client list.

Further, Plaintiff does not submit any evidence other than the "on information and belief" speculation that a Defendant (which one MSSB does not say) has any MSSB information or client information nor explain why the particular information qualifies as confidential information much less a trade secret.

### E. *MSSB Has No Legitimate Business Interest*

MSSB was a member of the Protocol for years, during which time it did not enforce agreements like the alleged agreements at issue here. During that time, MSSB regularly permitted financial advisors to leave and take with them lists of their clients and solicit their clients regardless of whether the financial advisor had signed a non-solicitation agreement. During that time, MSSB also hired financial advisors from competitor firms, who were similarly permitted to bring client information to MSSB and solicit clients to move their brokerage accounts to MSSB. After years of waiver and non-enforcement of its non-solicitation provisions, MSSB abandoned the Protocol this past November. MSSB cannot, in good faith, ask this Court to now enforce agreements that it ignored for thirteen years. Nor can it, in good faith, ask this Court to find that MSSB has a protectable business interest in the very same customer relationships that it permitted to walk out the door for over thirteen years. MSSB's did not and does not have a legitimate business interest.

### F.      Defendants Have Denied Any Wrongdoing

Each of the Defendants has submitted an affidavit. ***See Group Exhibit 3***. In those affidavits, Defendants, among other things, deny that they took or retained any MSSB information or client information and deny solicitation. Consequently, the parties are at issue and an evidentiary hearing is necessary to resolve the instant dispute.

## V.      Plaintiff will not suffer irreparable harm

MSSB suggest that it will suffer irreparable harm without an injunction. This is wrong. MSSB has not alleged anything done by any of the Defendants. It has cobbled together a couple speculative claims resting on conjecture and hearsay. To the extent that MSSB believes a claim "on information and belief" that certain information may have been taken can satisfy the irreparable harm standard, MSSB is arguing that the standard can be satisfied with a mere guess. This is not the law. MSSB cannot allege irreparable harm, first and foremost, because it is not even certain it has been injured at this point. And, as explained below, MSSB has an adequate remedy at law.

What is more, MSSB cannot claim irreparable harm because even if the Defendants took information (and they did not), and even if they solicited MSSB customers (and they did not), MSSB freely allowed those things to happen for years under the Protocol for Broker Recruiting thereby admitting that such action could not rise to irreparable harm.

## VI.      The Balance of Harm Favors Defendants

On this record, MSSB clearly speculates and fails in any way to make a showing that Defendants did anything wrong. Still, MSSB requests that the Court impose the drastic remedy of an injunction. Amazingly, MSSB suggest that the balance of harms favors it, a national brokerage house, with billions of dollars at its disposal. MSSB wholly ignores the cataclysmic

effect that an injunction would have on the good-will and business reputation of each of the Defendants – hard working financial advisors working in small community where reputations still count and news travels fast.  Given that MSSB cannot come close to alleging any bad act by any Defendant, the balance of the harms clearly favors Defendants.

## VII.    MSSB Has an Adequate remedy at Law

Where money damages would make the movant whole, it is not entitled to an injunction. *D.U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016).  As an initial matter, neither the motion nor supporting memorandum establish that anyhing has been taken by Defendants.  As such, no relief is necessary.  But, even so, to the extent that MSSB believes that it has or will lose a customer because anything said or done by any Defendant, that loss is obviously compensable by money damages and the amount of net profit from the customer relationship easily computable by MSSB.  Additionally, following this injunction proceeding, the parties are going to proceed to FINRA to address the merits of this matter and to specifically address money damages.  If MSSB did not think it could be made whole for whatever injury it believes it has, it certainly would have no reason to proceed to FINRA.

For the reasons stated above, Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction should be denied.

Dated: September 21, 2018

Respectfully submitted,

**DEFENDANTS, RONALD OUWENGA, BRIAN THOMAS, MYRON HENDRIX, MICHAEL BRUNER, JEFF SCHIMMELPFENNIG, and ZACHARY BIRKEY**

By: /s/ *Jason B. Hirsh*
        One of Their Attorneys

Gary I. Blackman (ARDC #6187914)
Jason B. Hirsh (ARDC #6283094)
Jamie L. Burns (ARDC #6300120)
LEVENFELD PEARLSTEIN, LLC
2 North LaSalle Street, Suite 1300
Chicago, Illinois 60602
Tel.:    (312) 346-8380
Fax:    (312) 346-8434
gblackman@lplegal.com
jhirsh@lplegal.com
jburns@lplegal.com

## CERTIFICATE OF SERVICE

I, Jason B. Hirsh, an attorney, hereby certify that on September 21, 2018, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties registered with the CM/ECF system.

*/s/ Jason B. Hirsh*