IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MORGAN STANLEY SMITH BARNEY LLC, | : |
| Plaintiff, | : |
| v. | : Case No. 18-cv-06373 |
| RONALD OUWENGA, BRIAN THOMAS, MYRON HENDRIX, MICHAEL BRUNNER, JEFF SCHIMMELPFENNIG, and ZACHARY BIRKEY, | : Hon. Joan B. Gottschall : Magistrate Sidney I. Schenkier |
| Defendants. | : |

**REPLY MEMORANDUM IN SUPPORT OF MORGAN STANLEY'S
RENEWED MOTION FOR A TEMPORARY RESTRAINING ORDER**

I. **INTRODUCTION**

Morgan Stanley Smith Barney LLC ("Morgan Stanley") respectfully submits this Reply in support of its Renewed Motion for a Temporary Restraining Order. Morgan Stanley's entitlement to a TRO is overwhelming, and it is abundantly clear that Defendants have perpetrated a fraud upon this Court. Now, having been caught "red-handed" in a veritable web of lies, Defendants go to desperate lengths to try to explain away their conduct and evade being held to their contractual and other legal obligations. Defendants cannot do so.

Indeed, in their opposition, Defendants (all of whom *expressly consented* to the issuance of injunctive relief in their agreements in the event of a breach)1 do not even address, much less deny, that:

- Contrary to the averments in their Declarations, *signed under penalty of perjury*, that "I can state unequivocally that I did not take or retain any MSSB information *or*

---

1*See* Amended Complaint, ¶¶ 18, 28.

*client information*," Defendants collectively retained the contact information of **hundreds** of Morgan Stanley clients in their cell phones (Morgan Stanley's Initial Memorandum at 2);

- Defendants filed *false and verified* interrogatory responses claiming they contacted Morgan Stanley clients through "memory, the White Pages, and other public sources, such as the Internet," only to later admit that at least four used *"certain information that was on his phone"* to contact Morgan Stanley clients;

- Hendrix, after claiming "unequivocally" in his Declaration not to have retained "any client information," and verifying in his interrogatory response that he contacted Morgan Stanley clients through "memory, the White Pages, and other public sources, such as the Internet," likewise amended his verified interrogatory response to state he used information obtained "*presumably* from the internet";

- Ouwenga, having made the same false claims both in his Declaration and interrogatory response, printed a client list from a third-party vendor he had utilized at Morgan Stanley only two days after his resignation, and used this list containing the names, addresses and birthdays of 347 Morgan Stanley clients to contact these clients. (Morgan Stanley's Initial Memorandum, Exhibits A, C-D; Morgan Stanley's Opposition to the Motion to Dismiss, Exhibit F); and

- Defendants all defied the explicit instructions of their current employer, Stifel Nicholaus ("Stifel"), not to retain any client information including on their cell phones.

Unable to deny their "unequivocal" representations to the Court, which have proven to be patently false, and *saying not one word* in their opposition brief about their false interrogatory responses or their failure to adhere to Stifel's instructions, Defendants now argue, in a further effort to delay being held to their contractual commitments, that the information they

secretly retained and used "belong to Defendants" and is "not confidential." Defendants made no such argument at the TRO stage. Instead, not wanting to leave anything to chance, and allow the Court to issue a ruling based on the true facts, Defendants filed false Declarations. Only now, when the truth has been revealed, do Defendants completely change course.

Defendants' arguments are entirely hollow and fail on multiple grounds. First, in their Declarations, Defendants swore "unequivocally" not to have "any MSSB information *or client information*." Defendants cannot credibly claim that the contact information of Morgan Stanley clients (in this case hundreds) is not "client information." The fact that Defendants may "own" their cell phones is meaningless as well. It is the information on those cell phones, and the information Ouwenga improperly accessed after his resignation, which is at issue.

Indeed, this information is both "MSSB information" and "client information." Defendants' JPAs state they cannot "retain any information regarding any such Client Accounts, including but not limited to, a list of Morgan Stanley client names and/or client contact information." (Exhibit A to the Amended Complaint at 3, ¶ IV). The FA Agreements signed by Ouwenga and Hendrix similarly define "TRADE SECRETS AND OTHER CONFIDENTIAL INFORMATION" to include, *inter alia*, "the names, addresses, [and] telephone numbers" of Morgan Stanley clients. (Exhibit C to the Amended Complaint at 1, ¶ 2).

Even Stifel is in full agreement, instructing Defendants not to retain any client information on their cell phones. (Morgan Stanley's Initial Memorandum, Exhibit B). In their initial interrogatory responses, Defendants also were careful to state only that they had not retained any "Morgan Stanley documents." This shows that even Defendants concede the client information they retained on their phones is "MSSB information."

Defendants' suggestion that "many" of the clients at issue pre-date their

employment with Morgan Stanley, or are "family members, friends, [and] personal relationships," even were it legally relevant (which it is not), is groundless. (Defendants' Opposition at 1). Ouwenga's entire career in the securities industry has been with Morgan Stanley or its predecessors. Birkey spent less than a year at a small firm before joining a Morgan Stanley predecessor (Smith Barney) in 2007, and the remaining Defendants have been with Morgan Stanley or its predecessors since 1993. Defendants' allegation that "many" of the clients pre-date their employment also is squarely contradicted by their own supplemental Declarations in which they claim merely they have known a "number" of the individuals since prior to their Morgan Stanley employment. (Defendants' Opposition, Exhibit 2 at ¶ 9).

Defendants also admit retaining and using information relating to "others" and/or "other individuals who were customers" – *i.e.* individuals with whom they had no relationship apart from acting as their Morgan Stanley Financial Advisor. (Defendants' Opposition, Exhibits 1, 2 at ¶ 6, ¶ 7, respectively). Indeed, while Defendants stridently opposed entry of a TRO based on alleged "speculation," faced with the hard reality of their concrete misrepresentations to the Court, it is they who now engage in rampant speculation. Ouwenga's supplemental Declaration uses the terms "to the best of my recollection," or "I believe" *seven* separate times. The other Defendants' supplemental Declarations are replete with this very same language.

Most significantly, Defendants' confidentiality obligations extend to *all* clients. Stifel's instructions to Defendants likewise do not distinguish between clients who supposedly were Defendants' "friends or family" as opposed to other clients. Defendants also fail to cite a *single* Illinois case holding that information relating to clients who supposedly are "friends or family" is not confidential, or that a Financial Advisor "owns" information relating to clients. In fact, in *IDS Fin. Servs v. Smithson*, 843 F. Supp. 415, 419 (N.D. Ill. 1994), the Court flatly

rejected Defendants' argument, holding: "The terms of the agreements are clear. That many of Smithson's clients are friends and were acquired through hard work and long hours is of no significance. The hard work and long hours were engaged for the benefit of IDS and were an essential part of his agreements with IDS. Smithson was aware from his agreements that no matter how he found his clients, he was limited to using IDS's products or services and that the clients would thus be serviced only by IDS. If Smithson did not like the arrangement offered by IDS, then he should not have accepted it."

Although every Financial Advisor has "family and friends" among his/her clientele, Illinois courts routinely grant injunctive relief prohibiting them from soliciting **any** clients or retaining information relating to **any** clients. *See, e.g., Merrill Lynch v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993) ("We are unable to conclude that the district court abused its discretion in granting a TRO enjoining the defendants from soliciting any business from Merrill Lynch clients and from disclosing Merrill Lynch records."); *Merrill Lynch v. Cross*, 1998 U.S. Dist. LEXIS 3188 (N.D. Ill. 1998) (issuing injunctive relief to enforce non-solicitation and non-disclosure provisions with respect to all clients serviced by the departing Financial Advisor); *Merrill Lynch v. Patinkin*, 1991 U.S. Dist. LEXIS 6210 (N.D. Ill. May 9, 1991 (same).

Crucially, nothing Defendants can say changes the fact that they made blatantly false representations to this Court. Had they been truthful, Morgan Stanley has little doubt the Court would have entered a TRO in September, and its claim for permanent injunctive relief would have been resolved long ago in FINRA. As the Court is aware and the parties do not dispute, under FINRA Rule 13804, if the Court issues a TRO, the case is set for expedited hearing before FINRA within 15 days. In this case, the arbitration panel has already been appointed by FINRA and is waiting to hear Morgan Stanley's claim for permanent injunctive

relief on an expedited basis when and if the Court issues temporary injunctive relief.

Remarkably, Defendants even have the audacity to claim that Morgan Stanley has engaged in "bad faith." (Defendants' Opposition at 5). It is Defendants who have engaged in extreme bad faith. Defendants evaded entry of a TRO by submitting perjured Declarations.2 Equally astounding, each Defendant has submitted supplemental Declarations, again under penalty of perjury, stating "I have never misled the Court or MSSB in my declarations to this Court." (Defendants' Opposition, Exhibits 1, 2 at ¶16, ¶10, respectively). Rather than recanting their prior false statements, Defendants "double down" and repeat them.

In sum, as critical as it is for Morgan Stanley to obtain a TRO, it is equally important that the integrity of these proceedings be preserved. Defendants' refusal to accept accountability for their own misconduct, disingenuous efforts to "shift the blame" to Morgan Stanley, and full endorsement of their prior false statements, is totally outrageous.

## II. DISCUSSION

### A. Morgan Stanley Has a Reasonable Likelihood of Success On the Merits

Morgan Stanley unquestionably has a reasonable likelihood of success on the merits. It is vital to note that nowhere do Defendants address the Seventh Circuit's ruling in *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1096 (7th Cir. 2008), holding that, where the other factors for a TRO weigh substantially in Morgan Stanley's favor, it need only establish a "more than negligible" chance of success on the merits of one of its claims. Clearly, this is the case here. At the argument, after noting what it deemed to be "the speculative nature of Morgan Stanley's evidence and the clear sworn denials of defendants," the Court proceeded to state: "I think Morgan Stanley could clearly establish irreparable injury if its proof

---

2 Defendants' statements unquestionably were false. They also were highly material and went to the very heart of the Court's determination as to whether a TRO should be issued.

on the merits were stronger." (Defendants' Opposition at 3). The proof that Defendants used information they swore they did not possess in order to contact clients is now undisputed.

The equities likewise weigh heavily in Morgan Stanley's favor. This Court accepted their sworn denials at "face value" and, as a result, Defendants bought themselves valuable time to continue diverting Morgan Stanley clients through the use of the very information they swore they had not retained. Defendants then delayed Morgan Stanley even further in discovering the truth by providing false interrogatory responses. Also, if a TRO is issued, FINRA will hold a hearing on permanent injunctive relief within only 15 days. In contrast, if no TRO is issued, Defendants will have even more time to violate their obligations and to inflict irreparable harm upon Morgan Stanley.

Although Morgan Stanley need only show a "more than negligible" chance of success on the merits, given that the other injunctive factors weigh so heavily in its favor, Morgan Stanley has a strong likelihood of success on the merits. In fact, Defendants have all but abandoned their primary defense, that their JPAs fail for a "lack of consideration" because they were signed less than two years before their resignations. As a threshold matter, Defendants never argued their confidentiality obligations failed for a lack of consideration. Ouwenga and Hendrix similarly never contended that any of their obligations in their FA Agreement failed for a lack of consideration. Defendants also do not deny signing JPAs containing non-solicitation covenants *more* than two years prior to resigning. (Amended Complaint, Exhibits H-J).

In any event, as set forth in the Initial Memorandum (at 7-9), six judges of this Court have refused to apply a "bright-line two year rule" for consideration. A seventh similarly rejected it in *Airgas United States, LLC v. Adams*, 2016 U.S. Dist. LEXIS 82869 (N.D. Ill. June 27, 2016). Defendants' claim that the JPAs/FA Agreements "lack mutuality," that Morgan

Stanley is "not a party to the JPAs," and their other defenses also are thoroughly refuted in the Initial Memorandum and Morgan Stanley's opposition to the motion to dismiss.

Defendants' claim that "Plaintiff puts forth no evidence, testimony or affidavits to support a claim that names and phone numbers are its 'confidential or proprietary' property" is frivolous as well (Defendants' Opposition at 2). The Affidavit of Octoberr Walter states very clearly that "[c]lient information including identities . . . is confidential and the exclusive property of the firm." (Walter Affidavit dated Sept. 19, 2018, at ¶ 12 (hereinafter, "Walter Aff.")). Ms. Walter further states that "Morgan Stanley has implemented strict procedures to ensure that highly secret and confidential customer information is secured and not available to the public. These steps include the Agreements signed by Defendants (and the FA Agreements signed by Ouwenga and Hendrix) which provide that client information is confidential and cannot be used for any purpose other than conducting the business of Morgan Stanley." (*Id.*); (*See also id.* at ¶ 13).3

The fact that Morgan Stanley's client information is confidential is confirmed by the JPAs and FA Agreements signed the Defendants, the averments in the Walter Aff., and by (i) the Illinois Trade Secrets Act, 765 ILCS 1065/4 ("the Act"), which defines "trade secret" to include a "list of actual or potential customers." Stifel's own policy similarly states "if any of your personal electronic devices contain customer information (actual or prospective), you must delete it prior to your resignation." As for Defendants' claim that the information on their phones or the "birthday list" is "publicly available," they merely state in their Declarations this is

---

3Contrary to Defendants' position throughout these proceedings, Morgan Stanley's Code of Conduct, which Defendants signed and agreed to, is also entirely enforceable. *Morgan Stanley v. Skowron*, 989 F. Supp. 2d 356, 361 (S.D.N.Y. December 19, 2013) ("Morgan Stanley's Code of Conduct, which was made a condition of Skowron's employment, expressly prohibits insider trading and *emphasizes the importance of preserving confidentiality.*") (emphasis added); *cf. Sherman v. Travelers Indem. Co.*, 2011 U.S. Dist. LEXIS 45739, at *5 (D. Conn. April 28, 2011) ("By electronically signing the Arbitration Policy and Defendant's Code of Conduct, which incorporated the Arbitration Policy, Plaintiff contractually bound herself to arbitrate all employment-related disputes. . . .").

the case for an unspecified "number" of individuals. (Defendants' Opposition, Exhibits 1-2, at ¶ 15, ¶ 9). Moreover, even if a client may be listed in the phone book, the fact that he/she is a Morgan Stanley client is not, and it would take Defendants a tremendous amount of time to locate the contact information for these hundreds of clients (if at all possible). That is why the Defendants wrongly used the information they retained to begin with, and this is precisely why the Act expressly protects a "list of actual or potential customers."

The fact that Morgan Stanley has not asserted a trade secrets claim (Defendants' Opposition at 12-13) also is irrelevant and solely the result of Defendants' deceptive conduct. Had Defendants been honest and forthright, Morgan Stanley would have included a trade secrets claim in its Amended Complaint. Illinois courts have consistently held that the client lists of financial services firms are entitled to trade secret protection. (Initial Memorandum at 11-12). Also, under the Act, injunctive relief is appropriate in the case of actual ***or threatened misappropriation***. *See* 765 ILCS 1065/3(a) (emphasis added). In any event, Morgan Stanley easily satisfies the "reasonable likelihood of success" threshold on its breach of contract and breach of duty of loyalty claims, especially in view of the irreparable harm it will suffer and the equities of this case. Indeed, even though Morgan Stanley has not asserted a trade secret claim, the fact that its client list is trade secret, *ipso facto*, makes it confidential and protectable under Defendants' many agreements.

Lastly, Defendants' reliance on the Protocol is specious. (Defendants' Opposition at 14-15). Contrary to Defendants' claims, *id.* at 15, by being a Protocol member, Morgan Stanley ***never*** "admitted that client names and contact information do not constitute protectable confidential or trade secret information." Morgan Stanley always retained the right to enforce its contractual and other rights in all cases where the departing Financial Advisor joined a non-

Protocol firm or failed to comply with the Protocol. In the case of Ouwenga, in fact, he violated the Protocol by improperly retaining the birthdates of nearly 350 clients. Defendants' reliance on an unreported 2006 Indiana state court decision is also baseless. Unlike the instant case, Merrill Lynch still remained a Protocol member at the time it filed that case. Even Stifel agrees the Protocol is irrelevant and instructed Defendants not to retain any information (instructions Defendants blatantly ignored). The Protocol simply has no application where, as in this case, Morgan Stanley is not a member. *See, e.g., Hilliard v. Clark*, 2007 U.S. Dist. LEXIS 64793 (W.D. Mich. Aug. 31, 2007) (court granted preliminary injunction to non-Protocol member to preserve the *status quo* pending a FINRA hearing).

### B. Morgan Stanley Has No Adequate Remedy At Law

Morgan Stanley's Initial Memorandum (at 12-13) cited a litany of Illinois cases making clear a firm suffers irreparable harm where its confidential information has been misappropriated. The Court previously recognized "Morgan Stanley could clearly establish irreparable injury if its proof on the merits were stronger." *See also Smithson, supra*, 843 F. Supp. at 418 ("Where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation of trade secrets will be irreparable.").

In an after-the-fact attempt to justify their false Declarations and interrogatory responses, Defendants feebly argue that Morgan Stanley did not demand the return of their cell phones. (Defendants' Opposition at 3). Defendants ignore completely, however, that Morgan Stanley demanded the return of all its client information – in any form, including in electronic form. (Exhibit A hereto). Morgan Stanley then sent a follow-up email demanding the return of "any other information (*in any form*) pertaining to Morgan Stanley clients, including, but not limited to, **client names, telephone numbers, addresses and email addresses**. . . ." (Exhibit B

10

hereto) (emphasis added).4

Defendants also contend they very recently "offered to delete the names of all Morgan Stanley customers from their phones" and Ouwenga offered "to terminate his subscription with the Birthday Company and turn over any birthday lists to his lawyers." (Defendants' Opposition at 5.). This is meaningless. Defendants already used this information to divert clients and neither the Court nor Morgan Stanley possibly can rely on Defendants' "word" that they no longer have possession of Morgan Stanley's confidential information.

Defendants' contention that a TRO is inappropriate since it is "over three (3) months after Defendants resigned" also is entirely specious. (Defendants' Opposition at 5). Any delay is ***solely attributable to Defendants' false representations***. Defendants did not start backing away from their false statements until October 24, when they finally stated only that they had not retained any "Morgan Stanley documents." Significantly, at the same time, Defendants falsely claimed they had contacted clients through "memory, the White Pages, and other public sources, such as the Internet." (Initial Memorandum, Exhibit A).

Not until nearly a month later, the day before the Thanksgiving Holiday, did Defendants finally amend their interrogatory responses to admit that (i) they retained client information; and (ii) used this information to contact clients. Mindful that the Court denied its initial TRO application based on the evidence, Morgan Stanley gave Defendants the opportunity to address the glaring inconsistencies between their Declarations, their initial interrogatory responses, and their amended interrogatory responses. In their reply brief in support of their

---

4Defendants' suggestions in their latest Declarations that Morgan Stanley should have installed "security software" on their cell phones or completely banned them from using their cell phones while at Morgan Stanley have no support in the law or reality. Indeed, Defendants knew full well that when they left Morgan Stanley, both from their explicit agreements with Morgan Stanley and the explicit instructions from their new employer, they were not to retain any information pertaining to Morgan Stanley clients. Even more important, the implementation of "security measures" is relevant only to a trade secret claim, and not to the breach of contract and other claims asserted by Morgan Stanley in this case.

11

motion to dismiss filed on December 10, however, Defendants said nothing. The very next day, Morgan Stanley filed its renewed TRO application. Simply put, Morgan Stanley acted as expeditiously as possible once it finally discovered the truth about Defendants' conduct.

Defendants' argument that the Court cannot resolve Morgan Stanley's renewed TRO motion "in a vacuum – without evidence or testimony" is equally baseless. (Defendants' Opposition at 4). The Court has all the evidence it needs to grant Morgan Stanley's TRO motion; namely, Defendants' own admissions.5 In a transparent effort to "muddy the waters," Defendants also suddenly filed a motion to compel. Defendants conspicuously fail to advise the Court that Morgan Stanley's counsel informed Defendants' counsel of its position with respect to the issue forming the basis of Defendants' motion to compel on October 10. (Exhibit C hereto).

Defendants' motion to compel, related to Morgan Stanley's "policies concerning its efforts to protect the confidentiality of its alleged client information," *see* Defendants' Opposition at 2, is without merit in any event. Not only did Stifel strictly instruct Defendants not to retain any client information, Morgan Stanley already has produced all the confidentiality agreements signed by Defendants, the additional measures Morgan Stanley employs to protect

---

5Defendants argue that "in almost all the cases [cited by Morgan Stanley], the Court's ruling came after a preliminary injunction evidentiary hearing with witnesses." (Defendants' Opposition at 6-7) (emphasis in original). In the seven cases referenced by Defendants, a temporary restraining order *was actually issued in three*, and there is no indication that the parties in the other matters even sought a TRO. See *A-Tech Computer Services, Inc. v. Soo Hoo*, 254 Ill. App. 3d 392, 395 (1st Dist. 1993) ("trial court entered a temporary restraining order against defendants to preserve the status quo and to restrict defendant pursuant to the non-solicitation agreement"); *Tyler Enterprises v. Shafer*, 214 Ill App. 3d 145 (3rd Dist. 1991) (no indication that TRO was sought); *Wolf and Company v. Waldron*, 51 Ill. App. 3d 239 (1st Dist. 1977) (same); *The Wessel Co., Inc. v. Busa*, 28 Ill. App. 3d 686, 693 (1st Dist. 1975) ("The order of the circuit court denying the issuance of a temporary injunction is reversed and remanded with directions to enter the temporary injunction pending the disposition of the case on its merits."); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (no indication that TRO was sought); *Falcon v. Corr's Beverages, Inc.*, 165 Ill. App. 3d 815, 818 (1st Dist. 1987) ("On October 24, 1986, a temporary restraining order was issued."); *Goodman v. Illinois Department of Financial and Professional Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (no indication that TRO was sought). Significantly, Defendants ignore the fact the TROs are routinely issued in these types of cases, including in *Merrill Lynch v. Salvano*, supra; *Merrill Lynch v. Cross*, supra; *IDS v. Smithson*, supra; *Merrill Lynch v. Patinkin*, supra.

the confidentiality of its client information are set forth in the Walter Aff., and Morgan Stanley has stood ready for months to produce Ms. Walter for a deposition.

In reality, the only ones "stonewalling" in the discovery process are Defendants. On December 4, Morgan Stanley counsel advised Defendants' counsel that "[a]t this juncture, although my client still has not received certain documents from your clients and awaits Stifel's production, we nonetheless are prepared to discuss deposition scheduling as soon as possible. Thanks, and I look forward to hearing from you promptly." (Exhibit D). ***Morgan Stanley heard nothing in response***. It is clear Defendants do not want to sit for testimony, either in a deposition or at a FINRA hearing. This is all the more reason that the Court should issue a TRO.

Defendants' citation to Morgan Stanley's FINRA claim is extraordinarily disingenuous as well. (Defendants' Opposition at 7). Defendants fail to advise the Court that, in addition to seeking damages for the harm inflicted upon it to date, ***Morgan Stanley also is seeking a permanent injunction from the FINRA panel***. Equally without merit is Defendants' contention that any TRO should be limited to the "non-use and/or return" of information because Morgan Stanley "has not set forth any new evidence (since its first motion was denied) that the Defendants wrongfully solicited any clients." (Defendant's Opposition at 6). Indeed, in the case of Ouwenga and Hendrix, both expressly agreed that "[i]n the event you breach ***any*** of your obligations" that Morgan Stanley would be entitled to a TRO enforcing ***all*** of their obligations, including their covenant not to solicit clients. (Amended Complaint, Exhibit C at ¶ 4.1).

Likewise, in the JPAs, Defendants agreed that a breach of "any" of their covenants would cause Morgan Stanley to "suffer immediate and irreparable harm" and entitle it to "appropriate injunctive relief." (Amended Complaint, Exhibit A at ¶ IV). Defendants have benefitted tremendously by improperly using Morgan Stanley's client information to divert

business to Stifel. Moreover, this Court cannot rely on the veracity of anything Defendants say, including any denials that they have solicited clients. It also would be a waste of judicial resources to require Morgan Stanley to engage in "piecemeal" litigation, issuing a TRO to enforce Defendants' confidentiality obligations now, only to entertain a totally separate TRO application at a later date. The only "appropriate injunctive relief," as provided for under the JPAs, is to require Defendants to honor all of their obligations.

Perhaps the case that best sums up Morgan Stanley's right to a TRO is *Patinkin*, *supra*, 1991 U.S. Dist. LEXIS 6210, where the Court stated it "believes that the denial of the extension of the TRO under the circumstances presented in this case would leave Merrill Lynch vulnerable to the same conduct from other employees. Hence, the potential harm plaintiff faces, on several levels, is enormous." *Id*. at **19-20. Here, even more so, Morgan Stanley and other firms would be left vulnerable to the same conduct from other employees in the future. In addition to violating their obligations, Defendants escaped accountability by filing false Declarations and false interrogatory responses. A TRO is necessary both to protect Morgan Stanley from further irreparable harm and to protect the integrity of the Court.

    **C.**    **Granting Injunctive Relief Outweighs Denial, Is In the Public Interest And Will Properly Restore the Status Quo**

Lastly, the benefit of a TRO far outweighs any detriment to Defendants and is in the public interest. Defendants have breached their contractual and other legal obligations to Morgan Stanley. Even worse, Defendants blatantly misled this Court in their Declarations.

In a strategic bid for sympathy, Defendants depict themselves as "hard working financial advisors working in a small community where reputations still count." (Defendants' Opposition at 15). If one were to accept this argument, any party would be free to submit false Declarations, provide false interrogatory responses, retain and use confidential information in

violation of their contractual and other obligations, ignore the express instructions of their new employer, but evade accountability simply because they live in a "small community." Any such argument is patently absurd. Furthermore, Defendants will not be precluded from engaging in their chosen profession. Morgan Stanley seeks only to enjoin Defendants from unfairly competing with Morgan Stanley by violating their covenants not to solicit clients or misuse confidential information.

Notably, in their opposition (at 15), Defendants spend only one paragraph on the equities and do not cite a single case. That is because Illinois courts repeatedly have held that the equities favor the firm, not those who violate their obligations. *See Merrill Lynch v. Cross, supra*, 1998 U.S. Dist. LEXIS 3188, at *6 ("The balance of hardships, in this case, also favors the plaintiff. The harm to Merrill Lynch from the defendant's use and disclosure of confidential information and trade secrets clearly outweighs any harm to Cross from refraining, for a very limited period of time, from contacting such customers and using Merrill Lynch's trade secrets and customer information."); *see also* Initial Memorandum at 13-14.

## CONCLUSION

Having fooled (or more accurately lied to) the Court once in order to evade a TRO, Defendants are seeking to repeat this same cynical strategy. But no matter how hard they try, Defendants cannot escape their false Declarations and interrogatory responses, blatant contractual and other breaches, and Illinois law. It is time for Defendants to finally live up to their commitments and to be held accountable for their misconduct. Morgan Stanley respectfully requests that its renewed motion for a TRO be granted.

        Respectfully submitted.

        /s/Jerry M. Santangelo
        Jerry M. Santangelo
        (ARDC#6187833)
        SPERLING & SLATER
        55 West Monroe Street, Suite 3200
        Chicago, Illinois 60603
        Tel: (312) 641-3200
        Fax: (312) 641-6492
        jsantangelo@sperling-law.com

        and

        /s/ Thomas J. Momjian
        Christopher C. Coss
        Thomas J. Momjian
        COSS & MOMJIAN, LLP
        111 Presidential Blvd., Suite 214
        Bala Cynwyd, PA 19004
        Tel: (610) 667-6800
        Fax: (610) 667-6620
        ccc@cossmomjian.com
        tjm@cossmomjian.com

Dated: December 19, 2018

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Plaintiff's Reply Memorandum to be served this 19th day of December, 2018, via the ECF system, to Defendants' counsel.

_____
Thomas J. Momjian