IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MORGAN STANLEY SMITH BARNEY LLC, | ) )  Case No. 18-CV-06373 |
| Plaintiff, | ) )  Judge Joan B. Gottschall |
| v. | ) ) |
| RONALD OUWENGA, BRIAN THOMAS, MYRON HENDRIX, MICHAEL BRUNER, JEFF SCHIMMELPFENNIG, and ZACHAY BIRKEY, | ) ) ) ) |
| Defendants. | |

**ORDER**

On September 19, 2018, Morgan Stanley Smith Barney LLC ("MSSB" or "Morgan Stanley"), filed a complaint and a motion for a temporary restraining order ("TRO") against a team of six of its former financial advisors who left Morgan Stanley earlier that month to work for Stifel Nicolaus, & Company ("Stifel"), a competitor. Morgan Stanley sought an order preventing the defendants, all of whom were based in MSSB's office in Bourbonnais, Illinois, from "[s]oliciting the business of any Morgan Stanley Client Accounts, excluding members of the Defendants' family;" using or transmitting client account information; and "[r]etaining, in any form . . . any Morgan Stanley Records and Information." Proposed TRO 2. Morgan Stanley's first motion for a TRO was denied in open court on September 26, 2018. ECF No. 29; *see also* Tr. of Hr'g ("Tr.") 19–28, ECF No. 30 (giving reasons for denial). This court advised Morgan Stanley, however, that if clearer evidence of defendants' use of MSSB's confidential information came to light, Morgan Stanley remained free to renew its motion. Tr. at 27:18–22.

1

The parties began conducting discovery in anticipation of a motion for preliminary injunction. *See* Minute Entry, Sept. 26, 2018, ECF No. 29. Morgan Stanley amended its complaint on October 15, 2018. 1st Am. Compl. ("FAC"), ECF No. 35. Defendants filed a motion to dismiss the FAC for failure to state a claim and for lack of subject matter jurisdiction. The motion was fully briefed on December 10, 2018. *See* Reply, ECF No. 61. Morgan Stanley renewed its motion for a TRO the next day, relying on evidence unearthed in discovery. ECF No. 63.

## I. Background

The FAC has three counts: a claim for breach of contract, a claim for breach of fiduciary duty, and an unfair competition claim. FAC 11–13. Morgan Stanley points to three types of documents it claims create confidentiality, non-disclosure, and non-solicitation obligations. Each year from 2016–17 each defendant signed a Joint Production Agreement ("JPA"), ECF No. 35 Ex. A, H–J, and each signed a governing document called a Joint Production Memorandum Agreement (JPMA"), *id.* Ex. B. Morgan Stanley also points to its 2017 and 2018 Code of Conduct, which defines "confidential information" as information "that is not generally known to the public" including the "identity of our clients," *id.* Ex. F at 36–38; Ex. G, at 15. Finally, defendants Ouwenga and Hendrix signed Financial Advisor Employment Agreements ("FA's") that include non-solicitation and confidentiality restrictions. *See id.* Ex. C.

Morgan Stanley alleges that the defendants violated those obligations. A newspaper article submitted by Morgan Stanley can be read as showing that the defendants are eligible to receive "back-end" bonuses if they move enough clients to Stifel. *See* FAC Ex. D at 3. Morgan Stanley alleges that the defendants have pursued clients by calling them, by reaching out to them on social media, and by sending them "packages." *See* FAC ¶¶ 5–11. Besides this, the

defendants allegedly retained client contact information and files, according to Morgan Stanley. *See* FAC ¶¶ 11–14.

## II. Motion to Dismiss The First Amended Complaint

The defendants contend that Morgan Stanley cannot enforce the JPA's because it is not a party to them, that several clauses of the contracts and code Morgan Stanley relies on are unenforceable, that the Code of Conduct is not a contract at all, and that the FAC fails to adequately allege the elements of the torts of unfair competition and breach of fiduciary duty. Both sides also raise arguments they label as jurisdictional. Defendants claim that Morgan Stanley has not adequately alleged its own citizenship for purposes of establishing this court's diversity jurisdiction under 28 U.S.C. § 1332(a). Mem. Supp. Mot. to Dismiss 17, ECF No. 40. Morgan Stanley contends that this court lacks jurisdiction to decide whether the FAC states a claim upon which relief can be granted because the merits of the parties' dispute must be submitted to binding arbitration by the Financial Industry Regulatory Authority ("FINRA"), and under FINRA Rule 13804, the parties may apply to the court for preliminary injunctive relief, not a determination on the merits.

### A. Diversity Jurisdiction

Morgan Stanley asserts that this court has original subject matter jurisdiction under the diversity jurisdiction statute, 28 U.S.C. § 1332(a)(1), because the parties are citizens of different states and the amount in controversy exceeds $75,000. FAC 6. Section 1332(a) requires complete diversity of citizenship; that is, "no plaintiff may be a citizen of the same state as any defendant." *Altom Transp., Inc. v. Westchester Fire Ins. Co.*, 823 F.3d 416, 420 (7th Cir. 2016) (citing *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 829 (1989)). In the FAC,

3

Morgan Stanley alleges that the defendants are residents[1] and citizens of Illinois and that it is a limited liability corporation ("LLC") organized under Delaware law with its principal place of business in New York. FAC ¶ 19–20.

The FAC's allegations do not establish Morgan Stanley's citizenship. As the defendants argue, Morgan Stanley must allege the citizenship of each of its members. "The citizenship of a limited liability company is that of its members . . . and its members may include partnerships, corporations, and other entities that have multiple citizenships." *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 347 (7th Cir. 2006). To satisfy itself that it has diversity jurisdiction, the court needs to know the members' citizenships and, if necessary, the citizenship of any of its members must be further traced through multiple layers of membership. *Id.* at 348. The FAC here does not identify MSSB's members, *see* FAC ¶ 19, so it falls short of what is required.

The information needed to determine Morgan Stanley's citizenship can be found elsewhere in the record, however. Evidence outside the complaint may be used to establish a party's citizenship. *See, e.g.*, *Hicklin*, 439 F.3d at 348 (looking to corporate disclosure statements but finding them unilluminating); *Am.'s Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1073–74 (7th Cir. 1992) (substantially same). MSSB traces its membership through four layers of ownership in its response to the defendant's motion to dismiss and in its Local Rule 7.1 corporate disclosure statement. *See* ECF No. 49 at 23–24; ECF No. 5 at 1–2. The LLC's have two corporations as members, and those corporations are incorporated in Delaware and keep their principal places of business in New York. *See* ECF No. 49 at 23–24 &

---

[1] A person's state of residence does not always equal the person's domicile, which is what counts when determining citizenship for diversity jurisdiction purposes. *See, e.g., RTP LLC v. ORIX Real Estate Capital, Inc.*, 827 F.3d 689, 692 (7th Cir. 2016); *Dakuras v. Edwards*, 312 F.3d 256, 258 (7th Cir. 2002). Thus, allegations of residence do not alone suffice. Because the FAC separately pleads the defendant's citizenship (*see* ¶ 20) and the defendants do not dispute that they are Illinois domiciliaries, the court finds the FAC sufficient to allege the defendants' citizenship.

Ex. G.  Defective jurisdictional allegations may be corrected.  28 U.S.C. § 1653; *but see Guar. Nat'l Title Co. v. J.E.G. Assocs.,* 101 F.3d 57, 59 (7th Cir. 1996).  Because the record is adequate for the court to determine the parties' citizenship and because complete diversity exists, the defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

### B. Authority to Reach Merits of Rule 12(b)(6) Motion

Since the inception of this lawsuit Morgan Stanley has contended that the merits are subject to mandatory and binding arbitration by the Financial Industry Regulatory Authority ("FINRA").  *See* FAC ¶ 17; *see generally Aslin v. FINRA, Inc.*, 704 F.3d 475, 476 (7th Cir. 2013) (discussing scope and origins of FINRA's authority to resolve disputes).  In Section V of the JPA's, those bound "agree that any dispute, claim or controversy that may arise between the Joint Producers and Morgan Stanley or any person or other entity, that is not otherwise resolved by Morgan Stanley in its sole discretion as set forth above, is required to be arbitrated . . . under the rules, constitutions, or by-laws (as may be amended from time-to-time) of any self-regulatory organization with which Joint Producers are or may become registered, including . . . FINRA."[2] ECF No. 35-10 Ex. J at 4.

Rule 13200(a) of FINRA's code of arbitration procedure ("FINRA Code") states that a dispute must be arbitrated if it "arises out of the business activities of a member or an associated person and is between or among Members; Members and Associated Persons; or Associated Persons."  *Webb v. Frawley,* 858 F.3d 459, 462 (7th Cir. 2017) (quoting rule).  Rule 13804(a)(1) of the FINRA code carves out an exception to the general rule.  In "industry . . . disputes required to be submitted to arbitration under the Code, parties may seek a temporary injunctive

---

[2] Alternatively, the JPA allows arbitration "pursuant to any arbitration agreement to which Joint Producers are a party." *Id*. at 4.

order from a court of competent jurisdiction." FINRA Code Rule 13804(a)(1). Morgan Stanley's FAC makes clear that it seeks only the "temporary injunctive relief" Rule 13804 allows, nothing more. FAC ¶ 17.

Based on the preliminary relief it seeks, Morgan Stanley argues that the court would exceed its jurisdiction if it were to decide the defendant's Rule 12(b)(6) motion. The defendants counter with arguments about the interactions between the Federal Rules of Civil Procedure and the FINRA Code. They point out that nothing in the FINRA Code expressly abrogates federal rules; that Morgan Stanly is invoking Rule 65, which governs injunctions; and that the court will have to decide the questions raised in the motion to dismiss either way because the plaintiff's likelihood of success on the merits must be assessed in a motion for a TRO or preliminary injunction. Reply 3, ECF No. 61.

Neither side frames the issues correctly. It is well established that "[w]hether an issue is subject to arbitration is a simple matter of contract interpretation." *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 638 (7th Cir. 2002) (citing *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999)). Thus, the question is not whether the FINRA Code abrogates the Federal Rules (of course it cannot) because the defendants can only be forced to follow FINRA rules to the extent they agreed to do so. *Webb*, 858 F.3d at 462 (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). And because whether the parties submitted this dispute to arbitration depends on contract law, an alleged agreement cannot deprive this court of subject matter jurisdiction to decide that question and, if appropriate, enforce the agreement because "the jurisdiction of the court cannot be conferred by consent, and cannot in a certain sense be defeated by waiver." *Adkins. v. Ill. Cent. R.R. Co.*, 326 F.3d 828, 833 (7th Cir. 2003); *see also Faur v. Sirius Int'l Ins. Corp.*, 391 F. Supp. 2d 650, 655 (N.D. Ill. 2005) (holding

forum selection clause did not destroy federal court's subject matter jurisdiction); *Chicago Typographical Union No. 16 v. Chicago Tribune Co.*, 648 F. Supp. 592, 595 (N.D. Ill. 1986) (holding allegations that contract was not formed did not defeat court's subject matter jurisdiction to decide whether that was true).

Here all of the defendants signed the JPA's, so they agreed to be bound by the FINRA Code. *See Webb*, 858 F.3d at 462. The question then becomes whether the disputes raised by the defendants' Rule 12(b)(6) motion fall into the exception for seeking preliminary injunctive relief under Rule 13804(a). The answer is no.

On the one hand, the defendant's Rule 12(b)(6) motion raises merits questions the parties have committed to FINRA. It is often said that a Rule 12(b)(6) motion "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012); *accord. Randle v. Bentsen*, 19 F.3d 371, 373 (7th Cir. 1994). But if the complaint is found deficient and no reason exists to give the plaintiff a chance to file an amended complaint and correct the original's defects, granting a Rule 12(b)(6) motion results in a "judgment on the merits" precluding the parties from relitigating those claims elsewhere. *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981) (citing *Angel v. Bullington*, 330 U.S. 183, 190 (1947)) (other citation omitted). Here, many of the defendants' Rule 12(b)(6) arguments concern the interpretation and enforceability of various provisions of the JPA's, FA's, and Code of Conduct. "Issues of contract interpretation and enforceability are questions of law." *E.T. Prods., LLC v. D.E. Miller Holdings, Inc.*, 872 F.3d 464, 467 (7th Cir. 2017). Were the court to decide those issues on a Rule 12(b)(6) motion, amendment of the complaint could not change the contractual language, so the interpretation and enforceability issues would effectively be resolved definitively by a ruling on the defendants' Rule 12(b)(6) motion.

On the other hand, deciding a motion for a TRO or preliminary injunction does not call upon the court to resolve definitively merits issues. TRO's and preliminary injunctions are intended to "minimize hardship to the parties pending the ultimate resolution of the lawsuit." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross*, 1998 WL 122780, at *1 (N.D. Ill. Mar. 13, 1998) (citing *Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988)). The court's analysis of the merits must in a real sense be tentative, limited to whether the plaintiff has "some likelihood of success on the merits. . . ." *Checker Car Club of Am., Inc. v. Fay,* 262 F. Supp. 3d 621, 626 (N.D. Ill. 2017).

Sometimes deciding merits issues on a motion for a TRO or preliminary injunction turns out to be completely unnecessary. Some cases turn on the plaintiff's failure to show that it will suffer an irreparable injury, for example. *See*, *e.g.*, *Local Union 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 191 F. Supp. 2d 987, 992–96 (N.D. Ill. 2001). In those circumstances, reaching merits questions on a Rule 12(b)(6) motion completely jumps the gun. And where the plaintiff's likelihood of success on the merits must be assessed, the necessarily tentative assessment leaves room for FINRA to reach an independent conclusion on questions like contract interpretation and enforceability. *See AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573–74 (7th Cir. 1999) (emphasizing that "preliminary injunctions are 'by [their] very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by [their] for-the-time-beingness'") (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1435 (7th Cir. 1986)) (alterations omitted). Hence in a real sense the questions raised by the defendants' Rule 12(b)(6) motion go beyond seeking temporary injunctive relief to asking for a resolution of merits questions that the parties have agreed to submit to FINRA.

This conclusion accords with the Seventh Circuit's rule that where, as here, an arbitrator has authority to issue temporary relief, a court's TRO should be effective only "until the arbitration panel is able to address whether the TRO should remain in effect." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993) (quotation omitted); *see also Smith Barney, Inc. v. Darling*, 2009 WL 1544756, at *1 (E.D. Wis. June 3, 2009) (relying on this principal where the parties agreed to be bound by the FINRA Code). District court decisions recognizing that addressing the merits when FINRA Rule 13804 applies risks interfering with the arbitration process lends further support. *See E*TRADE Fin. Corp. v. Pospisil*, 2018 WL 4205401, at *6 (N.D. Ill. Sept. 4, 2018); *Prudential Ins. Co. of Am. v. Hosto*, 2008 WL 4482882, at *2 n.1 (S.D. Ill. Oct. 2, 2008).

For these reasons, the court determines that the parties have agreed to arbitrate this dispute, that FINRA Rule 13804 applies, and that the rule does not carve out an exception for the disputes raised by the defendants' Rule 12(b)(6) motion. As Morgan Stanley has already initiated arbitration before FINRA, FAC ¶ 17, the court denies the Rule 12(b)(6) motion without prejudice to resolution of the same issues by FINRA.

### III. Renewed Motion for a Temporary Restraining Order

Temporary restraining orders and preliminary injunctions are intended to "minimize hardship to the parties pending the ultimate resolution of the lawsuit." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross*, 1998 WL 122780, at *1 (N.D. Ill. Mar. 13, 1998) (citing *Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988)). "A temporary restraining order 'is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing.'" *Checker Car Club of Am., Inc. v. Fay,* 262 F. Supp. 3d 621, 626 (N.D. Ill. 2017) (quoting *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp. 2d

9

798, 803 (N.D. Ill. 2008)); *Sw. Airlines Pilots' Ass'n v. City of Chicago*, 186 F. Supp. 3d 836, 839 (N.D. Ill. 2016) (quoting *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)). The party moving for a TRO must make "a threshold showing: (1) that the movant has some likelihood of success on the merits of the underlying litigation; (2) irreparable harm to the plaintiff; and (3) no adequate remedy at law exists." *Checker Car*, 262 F. Supp. 3d at 626 (quoting *Illusions Too Reality, LLC v. City of Harvey*, 2003 WL 260335, at *4 (N.D. Ill. Feb. 4, 2003)). The court must consider the balance of harms if this threshold showing is made by weighing "the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently and [by] consider[ing] the interest of the public in whether the injunction is to be granted or denied." *Id.* (same quotation); *see also Stuller, Inc. v. Steak N Shake Enter.,* 695 F.3d 676, 679 (7th Cir. 2012).

    A. <u>Likelihood of Success on the Merits</u>

The denial of Morgan Stanley's first motion for a TRO was based mainly on the inferential and speculative nature of the evidence presented by Morgan Stanley that any prohibited solicitation or other violations were occurring. *See* Tr. at 19–21, 25–27. The record was quite thin and preliminary, and each defendant submitted an affidavit averring, "I do not have any MSSB information or client information in my possession, control, or custody." *E.g.,* Birkey Decl. ¶ 8, Sept. 21, 2018, ECF No. 16-3. Now Morgan Stanley argues that the evidence that has come to light during discovery shows that the defendants' averments were "untrue." Mem. Supp. Renewed Mot. TRO 5–6, ECF No. 63.

Morgan Stanley's accusations are serious. To substantiate them, Morgan Stanley refers to the defendant's verified answers to questions four and five of its revised first set of interrogatories:

10

> 4. Identify all Morgan Stanley clients for whom [the defendant] retained their [sic] names, addresses, telephone numbers or email addresses, in written, typed, or electronic form, upon his resignation from Morgan Stanley.
>
> . . . .
>
> 5. Identify the source of information used by [the defendant] to contact Morgan Stanley clients following his resignation of their [sic] employment at Morgan Stanley.

ECF No. 63-1 at 4, 5. During discovery, each defendant averred in verified responses dated either October 23, 2018 or October 26, 2018, that "he did not retain any Morgan Stanley document(s)." *E.g., id.* at 5. Morgan Stanley sees these answers as a dodge. It asked about specific information, names, addresses, and telephone numbers, yet the defendants responded that they kept no documents.

Morgan Stanley says that this was an intentional hedge, referring the court to the defendants' responses to question five. In October 2018, the defendant answered that he "used his memory, the White Pages, and other public sources, such as the internet[,]" to contact Morgan Stanley clients after resigning. *E.g., id.* at 5. The defendants amended their verified answers to question five in November 2018. *See* ECF No. 63-3.

Defendants Birkey, Bruner, Schimmelpfennig, and Thomas averred in their amended responses that each used a list created by memory, certain information that was on his phone, information provided by certain customers for their family and friends, the White Pages, fastpeoplesearch.com, Google, and other public sources, such as the internet. ECF No. 63-3 at 3, 6, 9, 12. Defendant Hendrix "used a list created by memory and information that temporary employees were able to obtain, presumably from the internet." ECF No. 63-4 at 3. And defendant Hirsh "used a list created by memory, . . . the White Pages, fastpeoplesearch.com,

11

spokeo, and other public sources, such as the internet." ECF No. 63-5 at 3 (internal citation omitted).

Each defendant has since averred that he retained contact information for Morgan Stanley clients in his personal cell phone. Ouwenga Decl. ¶ 12, Dec. 17, 2018, ECF No. 66-1; Birkey Decl. ¶ 6, Dec. 17, 2018, ECF N. 66-2; Birkey Decl. ¶ 6, Dec. 17, 2018, ECF No. 66-2; Hendrix Decl. ¶ 6, Dec. 17, 2018, ECF No. 66-2; Schimmelpfennig Decl. ¶ 6, Dec. 17, 2018, ECF No. 66-2; Thomas Decl. ¶ 6, Dec. 17, 2018, ECF No. 66-2. Each defendant adds that he paid for the cell phone himself, that Morgan Stanley never reimbursed him, and that Morgan Stanley never installed software on the phone that would allow Morgan Stanley to "wipe" contact information. *E.g.,* Schimmelpfennig Decl. ¶ 5, Dec. 17, 2018, ECF No. 66-2.[3] The phones' contact list included the defendants' friends, family members, and other individuals "who were [Morgan Stanley] customers." *E.g., id.* ¶ 7. But each defendant adds that he has "known a number of the individuals referenced in the Phone Data [since] prior to my employment with MSSB,"[4] *id.* ¶ 8, and that much of the contact information is "publicly available," *id.* ¶ 9.

In 2007, Ouwenga signed up personally for a third-party website called The Birthday Card Company. Ouwenga Decl. ¶ 4, Dec. 17, 2018, ECF No. 66-1. The service permitted Ouwenga to enter a person's name, address, and birthdate, and the person would automatically be sent, at Ouwenga's personal expense, a card and box of candy on his or her birthday. *Id.* "The individuals listed in the Birthday Card Company account are comprised of my family, friends, and others, and many of these relationships predate my employment with MSSB," and

---

[3] The declarations dated December 17, 2018, of all defendants except Ouwenga are materially identical. *See* ECF No. 66-2.
[4] According to Morgan Stanley's reply, these statements are somewhat misleading. Morgan Stanley represents that four of the defendants have been with Morgan Stanley since 1993, that defendant Ouwenga worked for Morgan Stanley's predecessor for his entire career in the securities field, and that defendant Birkey worked for a year for another firm before joining a Morgan Stanley predecessor in 2007. ECF No. 75 at 4. Notably, if those representations are accurate, Ouwenga was working for a Morgan Stanley predecessor when he opened the website account discussed in the text, *infra*.

12

Ouwenga believes that much of their contact information is "publicly available." *Id.* ¶¶ 6, 7. According to Morgan Stanley, 347 names on the list are Morgan Stanley clients. Mem. Supp. Renewed Mot. TRO 4, ECF No. 63 (citing *id.* Ex. E). A printout of the list produced by Ouwenga bears the date September 15, 2018, three days after his resignation. *See* ECF No. 53, Ex. F.

The defendants claim that Morgan Stanley is wasting the court's time by bringing a bad faith or moot motion. ECF No. 66 at 5–6. Prior to the motion's filing, Ouwenga agreed to end his subscription to The Birthday Card Company and give any birthday list in his possession to his lawyers, and the defendants offered to delete the contact information for every Morgan Stanley client from their personal cell phones. *See id.* (citing email correspondence between counsel dated Dec. 11, 2018, Ex. D). This shows at least some good faith, but it misses the larger point.

The record shows that the defendants had client contact information in their possession and used it, in part, to contact Morgan Stanley's clients. The defendants argue in their briefing that they "owned" their personal cell phones, and Ouwenga argues that he personally "owned" the list from The Birthday Card Company. *Id.* at 2. That is rather like arguing that an employee can get off the hook for taking a company's confidential information by copying it into a notebook bought by the employee. What matters is the information, not the medium, and quite apart from whether that information qualifies for trade secret protection,[5] the text of the JPA's and other agreements define protected information to include client names and contact

---

[5] Morgan Stanley does not plead a claim under the Illinois Trade Secrets Act in the FAC, but it argues in the instant motion that it is likely to succeed on the merits of such a claim. The defendants counter, among other things, that Morgan Stanley has not taken adequate steps to protect client contact information, and they have filed a separate motion to compel Morgan Stanley to designate a corporate representative under Federal Rule of Civil Procedure 30(b)(6) to sit for a deposition on what steps it takes to protect client information. For the reasons stated in the text, the court need not consider the trade secrets claim because it finds that Morgan Stanley has a reasonable likelihood of success on one of its breach of contract claims.

information. *See* FAC at 1, FA, *id*. Ex. C ("the names, addresses, [and] telephone numbers" of Morgan Stanley's clients); JPA, *id.* Ex. A ("a list of Morgan Stanley client names and/or client contact information"); 2018 Code of Conduct, *id.* Ex. G. The defendants have never asserted that they misunderstood these definitions. Their affidavits address who paid for the birthday list and their personal cell phones, but notably the affidavits fall short of averring that the defendants subjectively believed that who paid for the cell phones and birthday card service changed the character of the underlying information. *See, e.g.,* Ouwenga Decl. ¶ 4, Dec. 17, 2018, ECF No. 61-1.

The new evidence therefore increases significantly Morgan Stanley's likelihood of success in showing as a factual matter that the defendants used information falling within the applicable definitions of the JPA's, FA's, and Code of Conduct to solicit Morgan Stanley clients.[6] The defendants would have the court find that the evidence at most shows that they retained client contact information, but not draw an inference of solicitation. Resp. 6, ECF No. 66. In their answers to question five, each defendant admitted to using information "to contact Morgan Stanley clients following his resignation of their [sic] employment at Morgan Stanley." *E.g.*, ECF No. 63-3 at 2. Maybe all of these contacts had nothing to do with soliciting business for Stifel. At the first TRO hearing, the court could not tell whether any calls were occurring at all. The calculus has changed. From the number of contacts Ouwenga printed three days after resigning and the defendants' admissions that they contacted clients, the probability that Morgan

---

[6] The defendants imply that making a finding on Morgan Stanley's likelihood of success in proving retention and solicitation without a hearing is inappropriate. They point out that an evidentiary hearing was held in many of the cases cited by Morgan Stanley. *See, e.g.*, *A-Tech Computer Servs., Inc. v. Soo Hoo*, 627 N.E.2d 21 (Ill. Ct. App. [1st Dist.] 1993); *see also* Resp. 11, ECF No. 63. That proves too much. If the parties wanted a hearing, one could have been scheduled. Instead the parties agreed to submit the instant motion on the papers at a hearing held December 12, 2018, and the defendants do not explain what new evidence would be forthcoming were a hearing to be held. *See* Resp. 11; Minute Entry, Dec. 12, 2018, ECF No. 65 ("By agreement of the parties, the motion will be submitted for decision on the papers.").

Stanley will ultimately succeed in proving that solicitation occurred becomes "better than negligible," which is what is required to obtain preliminary injunctive relief. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) (quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988)).

So Morgan Stanley has carried its burden on the factual question. The legal issues remain. In brief, the defendants assert that the confidentiality, non-disclosure, and non-solicitation provisions at issue are unenforceable or, as to the JPA's, that Morgan Stanley cannot enforce them because it is not a party to them.

At a minimum Morgan Stanley has demonstrated some likelihood of success on enforcing the confidentiality-protecting language of the 2018 Code of Conduct. *See* 2018 Code of Conduct 15, ECF No. 35 Ex. G. The defendants point to language in the Code of Conduct stating that it does not create a contract, but read in context that language indicates that the Code does not alter an employee's at-will status. *See id.* at 22 ("This Code is not a contract guaranteeing your employment or entitling you to any special privilege, rights or benefits."). The Code may not be a freestanding contract, but Morgan Stanley cites cases finding that it may nevertheless be contractually enforceable because financial advisors' continued employment is conditioned upon assent to it. *See Morgan Stanley v. Skowron*, 989 F. Supp. 2d 356, 361 (S.D.N.Y. 2013) (observing that "Morgan Stanley's Code of Conduct. . . was made a condition of Skowron's employment . . . and emphasizes the importance of preserving confidentiality."); *Sherman v. Travelers Indem. Co.*, 2011 U.S. Dist. LEXIS 45739, at *5 (D. Conn. April 28, 2011) (finding arbitration clause in Code of Conduct enforceable). The parties have not made the entire Code of Conduct part of the record, and the inquiry often can depend on a reading of the code as a whole as well as other contractual documents. *Compare CUNA Mut. Life Ins. Co. v.*

15

*Kuperman*, 1998 WL 409880, at *8 (N.D. Ill. July 7, 1998), *with Weber Shandwick Worldwide v. Reid*, 2005 WL 1651030, at *3–4 (N.D. Ill. May 12, 2005). As the basic principles of contract law that govern—offer, acceptance, and consideration for continued employment—Morgan Stanley's citations to cases finding its Code of Conduct enforceable suffice to make a showing of a reasonable likelihood of success on the merits. *Weber*, 2005 WL 1651030, at *1–6.

The court will not venture further into an analysis of the defendants' manifold challenges related to the enforceability of FA's or JPA's, leaving those matters appropriately for FINRA. The foregoing analysis suffices to establish that Morgan Stanley has some likelihood of success on the merits of at least one of its claims.

### B. Irreparable Injury and Lack of Adequate Remedy at Law

Irreparable injury for which there is no adequate remedy at law means harm that cannot "be fully rectified in a final judgment." *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1024 (7th Cir. 2017) (citing *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017)); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Stated differently, if the harm the plaintiff claims "is reparable by an award of [money] damages at the end of trial there is no need for preliminary relief." *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003).

At the hearing held September 26, 2018, this court stated, "On the subject of irreparable injury, I think Morgan Stanley could clearly establish irreparable injury if its proof on the merits were stronger; but, on this record, it is hard to find that it will be irreparably injured without a TRO, because it is not sufficiently clear that it is being injured at all." Tr. at 27–28. Again, the state of the record required considerable speculation to find that any defendant had client contact information and that any defendant was soliciting Morgan Stanley clients. That has changed.

For the reasons just discussed, the defendants now admit that they retained Morgan Stanley clients' contact information on their personal cell phones (and in Ouwenga's birthday list), and the inference that the defendants used that contact information to solicit Morgan Stanley clients is at least reasonable. *See* Part III.A, *supra*.

Morgan Stanley's stronger showing of a likelihood of success on the merits in its renewed motion triggers a presumption of irreparable injury. "Irreparable injury is presumed to occur when an ex-employee breaches a confidentiality agreement or a restrictive covenant." *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1339 (N.D. Ill. 1990) (citing *Bus. Intelligence Servs., Inc. v. Hudson*, 580 F. Supp. 1068, 1072 (S.D.N.Y. 1984)) (other citation omitted). The presumption exists because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill." *Ty, Inc.*, *supra*, 237 F.3d at 902; *see also Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994).

The defendants maintain, without citing authority, that any loss of a Morgan Stanley customer to Stifel can be rectified after trial by calculating Morgan Stanley's anticipated profits from the lost client. Resp. 8, ECF No. 66. They point to Morgan Stanley's FINRA filing, which requests damages for lost profits, and represent that damages experts routinely estimate lost profits in FINRA proceedings. *See id*. at 8–9 (citing Ex. 5 at 5, ECF No. 66-5). Finally, the defendants state, without evidentiary support, that their former clients have in the last three months made up their minds as to which firm they will use, so no harm will result. Resp. 9, ECF No. 66.

The defendants have not rebutted the presumption of irreparable injury here. First, they gloss over Morgan Stanley's request for permanent injunctive relief in its FINRA filing. ECF

17

No. 66-5 at 5. Second, they overlook the additional interests that courts have recognized justify equitable relief in these circumstances. When prohibited by an enforceable contract, soliciting and poaching a former employer's customers, if unchecked, deprives the former employer of "goodwill, competitive position, and continuity of business." *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools*, 420 F. Supp. 2d 866 (N.D. Ill. 2006); *accord ISC-Bunker*, 765 F. Supp. at 1339 (citing *Bus. Intelligence Servs.*, 580 F. Supp. at 1072). Morgan Stanley has not identified a client it has lost to the defendants' solicitations. But even if most former clients have made up their minds about staying with Morgan Stanley or switching to Stifel, continued unsuccessful solicitations can and do damage a company's good will. *Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 955 (N.D. Ill. 2007). The record contains some concrete evidence of lost good will. With its first motion for a TRO, Morgan Stanley submitted unrebutted evidence that a customer called Morgan Stanley to express confusion over receiving a "package" from one of the defendants after he had resigned. The economic impact of the customer's perhaps unfavorable impression of Morgan Stanley cannot be easily estimated. Additionally, violations of confidentiality agreements can be difficult to detect, making injunctive relief appropriate. *ISC-Bunker*, 765 F. Supp. at 1339 (citation omitted). Because the defendants do not dispel, or discuss, the foregoing concerns, they have not rebutted the presumption of irreparable injury.

### C. Balance of Harms

In considering the private interest affected by an injunction, the court weighs "the error of denying a preliminary injunction to the party who would win" against "the error of granting an injunction to the party who would lose." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 305 (7th Cir. 2003). When it ruled on Morgan Stanly's first TRO motion, the court considered the impact

entering a TRO will have on the defendants, who are members of a small community. *See* Tr. at 19-20. The court continues to recognize the significance of those interests.

Nonetheless, the court notes that the defendants now stop short of asserting that if a TRO is issued, they will be unable to "make a living" in their field or community. *Foodcom Int'l*, 328 F.3d at 305 (finding no irreparable injury when balancing harms); *see also* Resp. 17, ECF No. 66. Rather, the defendants say that the injunction will damage their reputations in their community. *Id.*

The court does not gainsay that the defendants' reputations will be damaged to some degree, but the harm to the defendants is blunted somewhat by the availability of arbitration. The court has stressed that its decision is very tentative, that the court has not even reached most of the important merits questions, that no depositions have been taken, and that the parties have agreed to resolve their dispute not in this court but before FINRA. Morgan Stanley argues vociferously that the defendants misled the court in sworn statements filed before the first TRO hearing. The court does not so find. Each defendant denies making false statements to the court in his affidavit dated December 17, 2018. *See* ECF Nos. 66-1, 66-2. There are often good explanations for what first appear to be inconsistencies in a witness's testimony, and the defendants have not had an opportunity to explain at a deposition or hearing. *See, e.g.*, *Tadesse v. Gonzales*, 492 F.3d 905, 911 (7th Cir. 2007) (citing *Shtaro v. Gonzales*, 435 F.3d 711, 716 (7th Cir. 2006)). Issuing a TRO ensures they will get that opportunity swiftly. By issuing a TRO, these and other issues will be decided expeditiously. FINRA Rule 13804(b) provides that if the court issues a TRO, a hearing before the arbitrators must be held within 15 days. As discussed above, any injunctive relief should be effective only so long as necessary to allow the

arbitrator to determine whether continued temporary relief is warranted. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 216 (7th Cir. 1993).

On balance then, the court finds that the harm to Morgan Stanley modestly outweighs the harm to the defendants. Morgan Stanley continues to face a threat to its ability to "maintain and pursue relationships with its customers"—customers whose contact information the defendants admit retaining and whom it is reasonable to infer the defendants solicited. *Brown*, 494 F. Supp. 2d at 955 (citing *Foodcom Int'l*, 328 F.3d at 305).

### IV. Conclusion

For the reasons stated, the defendants' motion to dismiss the first amended complaint, ECF No. 39, is denied on the merits of the defendants' arguments that this court lacks subject matter jurisdiction. It is otherwise denied without prejudice to reurging the same arguments before FINRA. The plaintiff's renewed motion for a temporary restraining order, ECF No. 63, is granted. The order will issue separately. Because a hearing on permanent injunctive relief will be held within 15 days before FINRA, the court will not set a preliminary injunction hearing. Given the parties' selection of FINRA as the forum to resolve this dispute, this action, including all discovery, is stayed pending arbitration proceedings. The defendant's motion to compel, ECF No. 67, is denied without prejudice in light of the stay of discovery and the arbitration proceedings. All settings are stricken. The parties are directed to file a status report on the arbitration on or before January 31, 2019.

Date: December 21, 2018             _____/s/_____
                                                        Joan B. Gottschall
                                                        United States District Judge